IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MAUREEN J. GUTHRIE,

        Plaintiff,

v.                                                                                                                                                               CIV 03-1399 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

# MEMORANDUM OPINION AND ORDER

      Plaintiff Maureen Guthrie was born on December 25, 1952, and has a college education. She worked as an elementary school teacher for more than twenty years until May 2000, when, at age forty-seven, she was asked to resign because of poor attendance, poor performance, angry outbursts with coworkers, and insubordination. She attributed her inability to perform her job to post-traumatic stress disorder and depression that began in 1990. After she left her job, she began therapy on a regular basis. She applied for benefits in August 2001 alleging she became disabled due to her mental condition as of the day she quit working. *See Administrative Record* ("*Record*") at 49-52, 59-60, 91, 94-99, 106, 120, 122, 134, 148.

      Administrative Law Judge David R. Wurm ("ALJ") secured testimony from a vocational expert and denied benefits at Step 5, finding that Plaintiff has the residual functional capacity to perform a "full range of light . . . work" with "moderate" limitations "on her ability to deal with the public, supervisors and coworkers." *Id.* at 23. He identified four jobs Plaintiff could perform: research assistant, proof reader, clerical sorter, and housekeeping. *Id.* at 24. The Appeals Council declined review on October 23, 2003, thereby rendering the ALJ's decision final. *Id.* at

5.

This matter is before the court on Plaintiff's motion to reverse or remand, where she claims that the ALJ erred in three respects. *See Docs. 10, 11.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. *See Docs. 3, 15.*

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

I find that ALJ Wurm did not apply the correct legal standards in two instances. I further conclude that remand is the appropriate relief because these errors are dispositive of remand beginning with the Step 3 analysis level.

The medical records were reviewed in detail after placing them in chronological order. That review reveals that Plaintiff entered therapy in August 2000 and participated in individual or group therapy several times a week continuously through July 2002. Even with therapy, she made a suicidal gesture in April 2001 and was hospitalized for in-patient therapy for three weeks.

The record contains well over one hundred and fifty pages of therapist or psychiatrist notes alone. Plaintiff's treating therapists included: Steven A. Washburn, Maruine Renville, and Cynthia Goldblatt, as well as others at the University of New Mexico Mental Health Center ("UNM-MHC"). Her treating psychologist during inpatient treatment was Dr. Jukelevics. Her treating psychiatrists were Dr. Fraser and others at the UNM-MHC.

ALJ Wurm's opinion discusses some of these records, although not always in chronological order. He concluded:

> A review of Ms. Guthrie's medical record as above reveals ***steady improvement in her depressive symptoms throughout,*** with the exception of her "suicidal gesture" in April 2001. The medical record is punctuated by the three assessments [from Ms. Goldblatt, Dr. Jukelevics, and Ms. Renville]. All three of these assessments place the claimant in hopeless despair and total disability. However, these assessments are in contradiction to the balance of the medical record.
>
> ***Dr. Fraser made quick progress with Ms. Guthrie*** through active manipulation of the claimant's medications and by involving her in encounter groups. Ms. Guthrie even worked as a volunteer at the Drop-in-Center and at Alcoholics Anonymous and found good support through those activities. The assessments of Ms. Renville and Goldblatt and of Dr. Jukelevics do not correspond to the documented improvement Ms. Guthrie made. Further, Ms. Renville and Goldblatt are masters-level counselors and are not certified psychiatrists. Dr. Jukelevics, while being a psychologist, only treated Ms. Guthrie over a three-month period while she was an inpatient at Del Amo Hospital in California in April 2001.
>
> ***The Administrative Law Judge gives more weight to the opinion of treating physicians who had the longest treatment relationship with the claimant. More weight will also be afforded to a physician whose specialty is psychiatry,*** in this case (20 CFR § 404.1527). The Administrative Law Judge finds that the treating source opinions of disability are not well-supported, are conclusory in nature, and in the case of the opinions of Ms. Renville and Goldblatt, are not made by highly qualified individuals.

3

> \* \* \* \* \*
> ***Dr. Fraser's assessment of the claimant's condition*** with treatment is more realistic and ***will carry substantial weight*** in the balance of the Administrative Law Judge's assessment of Ms. Guthrie's claim (Exhibit 12F, p. 11).
>
> The claimant's impairments are severe within the meaning of the Regulations but not severe enough to meet [a Listing]. The claimant's depression has been showed to improve over time. ***Dr. Fraser, who had the benefit of treatment of Ms. Guthrie's depressive symptoms since at least October 2000, assessed that the claimant's depression represented a mild - moderate impairment, but it was not severe.***

*Record* at 20-21 (emphasis added).

Although an ALJ need not discuss every piece of evidence, the "record must demonstrate that the ALJ considered ***all*** the evidence." *Clifton v. Chater,* 80 F.3d 1007, 1009 (10th Cir. 1996) (emphasis added). "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. In addition, "[i]t is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart,* 362 F.3d 676, 681 (10th Cir. 2004). On the basis of the record before me, I cannot conclude that ALJ Wurm's discussion satisfies these legal standards.

As I understand it, ALJ Wurm believed that Dr. Fraser's assessment of Plaintiff encompasses the entire period from October 2000 forward. ALJ Wurm also concluded that Plaintiff was steadily improving but that when she began treatment with Dr. Fraser, she "quickly progressed." However, on its face, the record does not support either of these conclusions.

First, Dr. Fraser specifically noted on the work-related activities questionnaire that it was not until February 2002 that ***she*** first saw Plaintiff. Furthermore, one of the forms signed by Dr.

Fraser specifically asks the person filling out the form to indicate which of three different periods the assessment encompasses. Dr. Fraser underlined the choice "current examination" and further noted that date was July 12, 2002. *See Record* at 356.

Also, Dr. Fraser noted that Plaintiff "began" at UNM-MHC "8/01." That note correctly depicts when Plaintiff began therapy with Ms. Goldblatt. It is incorrect insofar as when Plaintiff was first seen at UNM-MHC. In fact, Plaintiff first "began" therapy at the UNM-MHC in October 2000, when she sought emergency treatment. She continued with consultations at UNM-MHC concerning electroconvulsive therapy ("ECT") up until her suicide gesture. *See id.* at 332-38, 340, 342-44, 348-49.

Nowhere in the opinion, however, does ALJ Wurm mention the discussions about ECT or any other notations in her medical records preceding Plaintiff's suicidal gesture and notes from the subsequent hospitalization. Yet, that time frame constitutes almost one full year from the alleged date of onset. As ALJ Wurm noted, disability is defined as a "mental impairment . . . that has lasted or is expected to last for a continuous period of not less than 12 months." *Id.* at 17.

I acknowledge that some of Plaintiff's forty-three contacts with mental health services in the seven months from the time she began therapy with Mr. Washburn until her suicidal gesture could be construed as indicating progress on a particular day. On the other hand, viewing those records chronologically and in their entirety, the records also could be interpreted as indicative of a steady decline. Plaintiff's treatment after her alleged onset and leading to the suicide gesture is particularly probative since Dr. Fraser's opinion does not, on its face, encompass the majority of the period of disability at issue. This is illustrated by a summary of treatment notes attached to this opinion as Appendix A.

5

Also, the treating physician issue is two-fold. An ALJ must first determine if the opinion is entitled to controlling weight. Even if it is not, then the ALJ must also determine what weight to give the opinion, must clearly explain what weight the opinion is given and the reasons why that weight is assigned, and in so doing, must apply certain factors. *See Langley v. Barnhart,* ___ F.3d ___, 2004 WL 1465774 (10th Cir. 2004) (citing *Watkins v. Barnhart,* 350 F.3d 1297 (10th Cir. 2003)); *Robinson v. Barnhart,* 366 F.3d 1078 (10th Cir. 2004) (same).

In deciding to give substantial weight to Dr. Fraser's "opinion," ALJ Wurm did not discuss all of the information set forth in the forms Dr. Frazer had signed. Instead, he selected just a single sentence from one of her treating notes and deemed that to constitute the essence of her opinion. That treatment note states that Dr. Fraser reviewed those forms and assessed "Plaintiff with mod-mild impairment [illegible] but not severe." *Record* at 374.

Yet Dr Frazer further indicates in the same treating note that Plaintiff had asked her to "co-sign" the disability forms that had been filled out by her UNM-MHC therapist, Ms. Goldblatt. Dr. Frazer's specifically states that she ***"reviewed and agreed with"*** Ms. Goldblatt's assessments of limitations and work-related activities functional capacity as to the criteria for Listings 12.04 and 12.06. Indeed, on each of the forms Ms. Goldblatt had prepared, Dr. Fraser signed in the place provided for the "physician's signature." Dr. Fraser made just two changes to the forms – notations reflecting that the evaluation was for the date of the current examination (7/12/02) and that Dr. Frazer first started seeing Plaintiff in February 2002 as discussed above.

A thorough review of the substance of the responses on Listings forms reveals that Plaintiff *<u>met</u>* both Listings 12.04 and 12.06 by "medically documented" findings resulting in "marked" restrictions. While none of the categories of limitations on the work-related activity

rose to the level of "severe," several categories received a "marked" level of limitations. Per the legend on the work-related activities form, "marked" signifies "serious limitation in this area . . . ability to function is severely limited." *See id.* at 255-58. "Marked" impairments were identified in Plaintiff's ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities on schedule; maintain regular attendance and punctuality; sustain an ordinary routine without special supervision; make simple work-related decisions; accept instructions/respond appropriately to criticism from supervisors; respond appropriately to changes in work place; and set realistic goals or make plans independently of others. *Id.* at 356-57.

Thus, ***in context***, both Dr. Fraser and Ms. Goldblatt found listings-level conditions and marked impairment in work-related activities. Moreover, those findings are consistent with the assessments provided by Plaintiff's other treating sources. As illustrated in Appendix A to this opinion, there is evidence of deterioration from the alleged onset to the suicide gesture almost one year later. In the Fall 2001 after her suicide gesture and after the September 11th attacks, Dr. Jukelevics indicated that Plaintiff was markedly limited with respect to work-related activities. Around that same time, Ms. Renville administered a series of tests and, based on those tests, opined that Plaintiff was markedly or extremely impaired with respect to work-related activities. *See id.* at 268-69; *see also id.* at 273 (09/25/01 visit to Renville, who wrote: "Since the attack on NY, Maureen has been experiencing a downward spiral; a frequent experience for those with PTSD given the images of penetration, betrayal, and victimization in the media. She reports she feels much more vulnerable and unable to defend herself against boundary violations."). By Summer 2002, the Dr. Fraser/Ms. Goldblatt forms are still indicating listings-level severity for

7

Plaintiff's condition and marked impairments as to certain work-related activities.

The ALJ cited Dr. Fraser's familiarity with Plaintiff's condition through medical records going back to October 2000 as the justification for giving substantial weight to her opinion. Yet ALJ Wurm did not explain why he chose to credit only one sentence from Dr. Fraser's session notes rather than discussing the forms containing her signature that are directly relevant to his disability inquiry. Thus, even if ALJ Wurm's reasons for discounting all of the treating sources but Dr. Fraser satisfy the requisite analysis for treating physicians, his decision to give only once sentence of Dr. Fraser's opinion substantial weight does not.

Finally, the ALJ reasoned that none of the opinions from Plaintiff's other treating sources were entitled to any weight, because of the therapists' lack of credentials and Dr. Jukelevics' short term treatment of Plaintiff. In one portion of the opinion ALJ Wurm questions the state agency physician Psychiatric Review Technique as "optimistic," yet he relies on the assessment in making his listings determination. *See id.* at 21. The agency physician's opinion was based in part on the erroneous assumption that Plaintiff "has never been hospitalized." *Id.* at 256. For all of the above reasons, the ALJ's decision cannot stand.

"When a decision of the [Commissioner] is reversed on appeal, it is within this court's discretion to remand either for further administrative proceedings or for an immediate award of benefits." *Ragland v. Shalala,* 992 F.2d 1056, 1060 (10th Cir. 1993). Plaintiff urges that this Court reverse and award benefits. However, "[o]utright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose." *Sorenson v. Bowen,* 888 F.2d 706, 713 (10th Cir. 1989) (internal quotations omitted). Here, because the ALJ's discussion of the medical evidence is incomplete, further fact-finding is

necessary.  Furthermore, I agree with Plaintiff's assertions of error that demonstrate how the incomplete consideration of the medical evidence and treating opinions further impacted ALJ Wurm's credibility and residual functional capacity findings.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 10)* is GRANTED IN PART and the matter is REMANDED to the Commissioner for further proceedings.  A final order will enter concurrently herewith.

**IT IS FURTHER RECOMMENDED** that the Commissioner consider assigning this matter to a different ALJ upon remand to take a fresh look at the matter.  *See Sarchet v. Chater,* 78 F.3d 305, 309 (7th Cir.1996); *Sutherland v. Barnhart,* 2004 WL 1418384 (E.D.N.Y. 2004) (request to assign a different ALJ because "ALJ did not consider the entire record, nor did the ALJ provide good reasons for the weight he gave to the plaintiff's treating physician.").

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

# APPENDIX A
## Treatment notes prior to suicide gesture

10/3/00     (*Washburn*)     (Patient not ready to get a job).  *Id.* at 178.

10/29/00    (*Washburn*)     (Patient crying, hopeless, not sleeping, not taking antidepressants; Washburn discusses UNM-MHC services).  *Id.* at 176.

10/31/00    (*UNM-MHC*)      (psych emergency, GAF 35, to refer for evaluation of ECT therapy).  *See id.* at 352-54.

11/6/00     (*Washburn*)     (Patient has thoughts of suicide).  *Id.* at 175.

11/14/00    (*Washburn*)     (" willingness to apply for a sales job just now.  Can turn it down if not ready to accept.  Still difficult getting up [and] getting out of apt. . . .  She asked about EMDR. . . .  A:  Wants to move forward.  Remains very depressed.").  *Id.* at 174.

11/21/00    (*UNM-MHC*)      (Patient wants to try ECT; GAF 45; want to rule out major depressive disorder versus post-traumatic stress disorder; plan is to have Patient start cognitive therapy) *Id.* at 345-47.

11/28/00    (*Washburn*)     (seeing Dr. Heather Wood at UNM-MHC where she is now an established patient; A:  very depressed, hopeless, despair, no intent of taking life/harming self).  *Id.* at 173.

11/29/00    (*Washburn*)     (Washburn has telephone consultation with Dr. Woods and agrees Plf. is "good candidate for ECT" and that she may respond better to an SSRI).  *Id.* at 172.

12/01/00    (*UNM-MHC*)      (Patient wants to try ECT, been crying almost constantly lately and has thoughts of suicide, low interest and energy, poor sleep, cannot work; GAF 40; plan is to start Remeron to help with sleep).  *Id.* at 343-44.

12/5/00     (*UNM-MHC*)      (Patient reports improvement on Remeron, sleeping though night and a "little more upbeat'" during the day.  Assessed as moderately ill.  Asks if she might have BPD [borderline personality disorder], but a later note in the file says she does not meet criteria at that point).  *See id.* at 342.

12/06/00    (*Washburn*)     (side effects from medications, dizzy and foggy; more positive and optimistic today)  *Id.* at 171.

12/12/00 (*Washburn*) (Patient still in fog from drugs but "definitely" making her feel better; A: mood and affect seem brighter; psychomotor retardation less noticeable). *Id.* at 170.

12/18/00 (*Washburn*) (side effects of medications but depression is down, Patient encouraged to call Dr. Wood about symptoms). *Id.* at 168.

01/10/01 (*Washburn*) (Patient very depressed and hopeless, able to express her anger; Washburn to consult w/psychiatrist). *Id.* at 167.

01/19/01 (*UNM-MHC*) (Patient thinks Remeron hasn't helped, wonders about "ECT" A: MDD, moderate, still symptomatic on Remeron, requests ECT treatment, does not wish to pursue augmentation or other antidepressants). *Id.* at 341.

01/22/01 (*Washburn*) (to discuss ECT with psychiatrists at MHC; A: filled w/ generations of grief and tried to over-control emotions). *Id.* at 166.

01/24/01 (*UNM-MHC*) (electroconvulsive therapy consultation. A: MDD, moderate, likely dysthymic d/o as well and possible BPD, still depressed, Moderately ill, to schedule for electroconvulsive therapy; Dr. Marley talked with Washburn, who feels Patient may have borderline personality disorder and chronic depression, who stated Patient "has given up teaching/asked to leave . . . apparently 'exploded' during work [with] some colleagues"). *Id.* at 339-40.

01/29/01 (*Washburn*) (Patient "seems depressed" and plan is to help her prepare for ECT). *Id.* at 165.

01/30/01 (*UNM-MHC*) (Patient called for info on cost of ECT, considering her financial situation, doesn't qualify for UNM Care Plan). *Id.* at 338.

02/01/01 (*UNM-MHC*) (Patient called to talk to Dr. re: paying for ECT, which she would like ASAP). *Id.* at 337.

02/05/01 (*Washburn*) (Patient frustrated; A: "Life is such struggle for her. Little ego strength. Wants to be independent yet wants someone to take care of her;" will delay ECT until she sorts out insurance and finances). *Id.* at 164.

02/21/01 (*UNM-MHC*) (Patient depressed, anxious, having headaches and dizziness, worried that ECT will not work, doesn't think Remeron has helped but still taking it; awaiting info from insurance re: whether to go ahead with ECT; moderately ill; tearful and tired of being sick). *Id.* at 336.

02/28/01 (*Washburn*) (Patient frustrated over status of insurance options; assessed as "very depressed"). *Id.* at 163.

03/06/01 (*Washburn*) (Patient could not get out of bed day before but smiling in session; A: mood, affect, thinking seemed pos.; sounds pessimistic"). *Id.* at 162.

03/12/01 (*Washburn*) (Patient (wants to try EMDR and put off ECT; "Mood and affect seemed brighter though she said she cried all morning. She so much wants to get better."). *Id.* at 161.

03/13/01 (*Washburn*) (Patient calls to tell him she talked to Renville and they will do an initial assessment this week). *Id.* at 160.

03/13/01 (*Renville*) (Intake assessment: diagnoses major dysthymic disorder, and PTSD symptoms but no memory of trauma and generalized anxiety disorder; GAF of 40 with highest of 40 for last year; Patient reports moderate/frequent crying, severe/constant no energy, moderate/frequent phantom pain, severe/constant hypervigilant, moderate/frequent exaggerated startle response, severe/constant inability to engage in life activities, not able to conceive of a future, desperate over never being helped, not able to work, no friends). *Id.* at 303, 306.

03/14/01 (*Renville*) (Patient had called to ask Renville for session before Renville leaves on vacation). *Id.* at 302, 304.

03/15/01 (*Washburn*) (Renville called him because Patient called her complaining of thoughts of suicidal ideation; Washburn called Patient and she was feeling better, they discuss support systems and medication trial study at Dept of Psych, and Patient said she would call). *Id.* at 159.

03/16/01 (*UNM-MHC*) (have not done labs for ECT because Remeron "may be working better." Patient agrees to hold off on ECT and to switch Trazadone (which gives her a hangover) to Vistaril). *Id.* at 335.

03/21/01 (*Washburn*) (Patient had a bad day yesterday with crying spells but feeling good today which is "unusual/scary;" A: seems hopeful EMDR [with Renville] will be effective). *Id.* at 157.

04/03/01 (*Renville*) (Washburn and Renville conversation; Washburn and Patient talked about transferring Plf.'s primary care to Renville; he approved the transfer, and Renville agreed as long as Washburn would be her back up when out of town and he agreed; Patient has

        session with Renville where she is "decompensated and crying uncontrollably;" Patient asked Renville to see her two times per week, which Renville "believe[s] is appropriate given the level of emotional arousal she is experiencing."). *Id.* at 300.

04/05/01     (*Renville*)     (Patient installing a "safe place"). *Id.* at 299.

04/02/01     (*Washburn*)     (Patient likes Renville and wants to put treatment with Washburn on hold while she sees Renville). *Id.* at 156.

04/06/01     (*UNM-MHC*)     (A: as with major depressive disorder, recurrent, mood likely with dysthymia (Double depression), but Patient insists on diagnosis of PTSD; rated as moderately ill). *Id.* at 334.

04/10/01     (*Renville*)     (Patient working on installing a "safe place". *Id.* at 298.

04/10/01     (*UNM-MHC*)     (Patient call to Dr. because she wants to switch medications and try Zoloft again). *Id.* at 333.

04/12/01     (*Renville*)     (calls Patient to cancel appointment; Patient says she is OK and her parents are coming the next day). *Id.* at 296.

04/13/01     (*Renville*)     (Patient attempts suicide by taking pills; thereafter she drove off and caused a two-car accident where no one was injured, she told the officers she took the pills but they did not send her to a hospital; Renville calls Patient's psychiatrist, who agreed that Patient be assessed for an in-patient program). *Id.* at 296.